R. L. JOHNSON, Plaintiff,

v.

GOODYEAR TIRE & RUBBER COMPANY et al., Defendants.

INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, LOCAL UNION NO. 347, Plaintiff,

v.

GOODYEAR TIRE & RUBBER COMPANY, HOUSTON CHEMICAL PLANT, Defendant.

Civ. A. Nos. 69–H–899, 71–H–1027.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 10, 1972.

Gabrielle K. McDonald, McDonald & McDonald, Houston, Tex., for R. L. Johnson.

V. Reagan Burch, Jr., Daniel O. Goforth, Baker & Botts, Houston, Tex., for Goodyear Tire & Rubber Co.

William N. Wheat, Wheat & Bartlett, Houston, Tex., for Local Union No. 347.

## MEMORANDUM OPINION

CARL O. BUE, Jr., District Judge.

These two consolidated lawsuits were tried to the Court. The first action was instigated by a black employee against an employer and labor union and arises out of alleged racial discrimination in employment practices violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 and the Civil Rights Act of 1866, 42 U.S.C. § 1981. The second action was commenced by the labor union against the employer to prevent a unilateral abrogation of the collective bargaining agreement implemented by the employer allegedly to rectify a racially discriminatory provision in the collective bargaining agreement, but attacked here, notwithstanding the first suit, as being violative of section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185.

In the first lawsuit, plaintiff, a black employee of Goodyear Tire & Rubber Company (Goodyear), seeks on behalf of other black employees similarly situated injunctive relief and back pay as a result of alleged racial discrimination in employment practices by Goodyear and Local 347, International Union of Operating Engineers (Local 347) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Jurisdiction is invoked pursuant to 42 U.S.C. §§ 2000e–2(a), (c), 2000e–5(f) and 28 U.S.C. § 1343. Plaintiff contends that as a consequence of the employment practices and collective bargaining agreement entered into by the defendants black employees have been in the past and continue to be segregated by assignment to the labor department. It is further alleged that Goodyear's testing and high school educational requirements as well as the seniority provision in the applicable collective bargaining agreement serve to perpetuate this hiring discrimination.

In response to plaintiff's claim of racial discrimination defendant Goodyear, although apparently conceding past racial discrimination, contends that since 1962 it has not only stopped any racially discriminatory practices but, in addition, it has employed an active program to recruit and employ black employees into

non-labor department jobs. Specifically, it is asserted by Goodyear that blacks are no longer segregated in the labor department, that the testing and educational requirements, although abruptly abandoned on April 22, 1971, at the behest of the Office of Federal Contract Compliance, were employed solely to select the most qualified employees and not for any discriminatory purpose and that the seniority provision embodied within the collective bargaining agreement was negotiated in good faith and was not intended to discriminate against black employees. Defendant Local 347 alleges that it is not a proper party, since it had no control over Goodyear's hiring and employment practices made the basis of this lawsuit.

In the second lawsuit, Local 347 seeks to enjoin Goodyear from unilaterally annulling the seniority provision, article X, of the collective bargaining agreement or, alternatively, to prevent the amendment of the article in such a manner so as to impose a seniority system that is patently discriminatory as to other employees in the applicable bargaining unit. Goodyear alleges that since it does substantial work for the government, it is subject to the regulations of the Office of Federal Contract Compliance of the United States Department of Labor. In accordance with regulations promulgated pursuant to an Executive Order, Goodyear is required to abolish its allegedly discriminatory seniority provision in the collective bargaining agreement and substitute a provision which would give black employees who transfer out of the labor department whatever seniority they have previously acquired. On September 7, 1971, Goodyear openly announced that it intended to amend article X of the collective bargaining agreement and substitute a new seniority provision.

On November 19, 1971, this Court preliminarily enjoined Goodyear from abrogating the seniority provision. The Court took this course of action after reviewing the anti-injunction section of the Norris-LaGuardia Act, 29 U.S.C. § 101, in conjunction with section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and thereupon concluding that the state of the law with respect to enjoining employers from abrogating a collective bargaining agreement was unclear. Under the circumstances the Court chose to resolve the question on general principles of equity and, accordingly, ordered the status quo maintained pending trial on the merits of the two causes of action. *See* Retail Clerks Union Local 1222 v. Alfred M. Lewis, Inc., 327 F.2d 442 (9th Cir. 1964); Local Union No. 328 v. Armour & Co., 294 F. Supp. 168 (W.D.Mich.1968). *See also* Annot., 16 L.Ed.2d 1143 (1967). Local 347 stipulated at the hearing on the motion for preliminary injunctive relief that any disposition of the first lawsuit, including any Court ordered change in the seniority provision of the collective bargaining agreement, would be dispositive of its prayer for relief in the second action. Such a stipulation serves to simplify the task of this Court in resolving the issues contained in these two consolidated lawsuits.

## I.

### *Factual Background*

#### A. *The Company and Union*

Goodyear's Houston plant which is devoted exclusively to the production of synthetic rubber was operated for the United States Government from 1943 to 1955. In 1955 Goodyear assumed ownership of this plant and thereafter has continuously operated the plant in a private capacity. In 1957 when Goodyear undertook to expand the plant's facilities, a rule was imposed requiring that any applicant for employment to any non-labor department and any employee seeking a transfer to any non-labor department possess a high school education or its equivalent, and achieve a satisfactory score on certain tests, primarily an adaptability test prepared by Science Research Associates.

Goodyear as the employer and Local 347, which has represented the produc-

tion and labor department employees at this plant in contract negotiations since 1943, have employed through the collective bargaining agreement a form of departmental seniority system at this plant. An employee, pursuant to this system, began accumulating seniority in a department upon entering it and thereafter utilized such accrued seniority within this departmental group when moving between job assignments, when layoffs occurred and in other instances in which seniority was a controlling factor. However, there has never been any established procedure for transferring seniority from one department to another. Before July 24, 1970, transferring employees retained their seniority in the former department for two years. Since July 24, 1970, a transferring employee, although unable to transfer his previously accrued seniority to the new department, has been able to retain seniority in the former department indefinitely.

As a result of Goodyear's employment hiring practices it is an undisputed fact that until July 14, 1962, black applicants seeking employment at the plant were segregated into the labor department, and until September 7, 1965, white applicants were funneled away from the labor department. It is also undisputed that the employment positions in the labor department were composed of the least skilled and lowest paid positions in the applicable bargaining unit at this plant.

In 1962 Goodyear became involved in the Plans for Progress Program, a voluntary program created for the purpose of improving employment opportunities for minority groups. Thereafter, Goodyear undertook to employ minorities in all departments of the plant. Procedures were established whereby black employees in the labor department could request transfers to other departments if they could satisfy the educational and testing requirements. Further, on three occasions Goodyear, at the behest of the OFCC, offered to relax the educational and testing requirements as applied to labor department employees. First, in 1968 all employees hired in the labor department prior to 1957 were given the opportunity to transfer to other departments if they had attained a seventh grade education and were able to achieve a satisfactory score on the tests. No affirmative results were obtained, since no minority group employee was able to pass the tests. Second, in 1969 the same group was given the opportunity to transfer without taking the tests. However, in view of the distinct disadvantage incurred when transferring, whereby accrual of seniority in the new department for transferring employees only commenced on the date of transfer, little success was attained in placing blacks in departments other than the labor department. Four employees were eventually transferred. Finally, after the educational and testing requirements were abolished on April 22, 1971, labor department employees hired prior to September 7, 1965, were given the opportunity on September 7, 1971, to transfer without satisfying the educational or testing requirements and, most importantly, to carry with them their labor department seniority.

### B. The Plaintiff

The plaintiff, a high school graduate, was initially employed by Goodyear in the labor department on September 18, 1944. After submitting an application for employment and without taking any type of employment test, he was assigned to that department where he continued to work as a laborer. At no subsequent time has this employee ever taken the employment tests made the subject of this lawsuit.

On May 4, 1967, plaintiff filed a charge of racial discrimination against Goodyear and Local 347 with the Equal Employment Commission (EEOC) alleging racial discrimination in that Goodyear "has a practice of upgrading Negroes in one manner and the way they upgrade the white employees [is] different" and that this particular employer administers tests unfairly. It was also charged that the union, Local 347, ac-

quiesced in these discriminatory practices and failed to represent black employees fairly. After an investigation the EEOC concluded that reasonable cause did exist to believe that Goodyear violated the Civil Rights Act of 1964 by discriminatorily applying its testing requirements. However, this investigative agency concluded that there was insufficient evidence to properly determine if Local 347 had also employed discriminatory practices violative of the Act. After efforts at conciliation failed, plaintiff filed this action pursuant to Title VII of the Civil Rights Act of 1964, initially naming Goodyear as the sole defendant. Approximately two months prior to trial this Court granted plaintiff's unopposed motion to join Local 347 as a defendant pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981. The amended complaint, in addition to naming Local 347 as a defendant, alleges that Goodyear's discriminatory practices are violative of both Civil Rights Acts.

## II.

*Defendants' Preliminary Contentions*

Preliminarily, defendants have asserted three contentions in an attempt to forestall or whittle down the significance of plaintiff's action. First, it is asserted that the action must be dismissed since an indispensable party, Local 347, was not joined as a party defendant within the statutory period prescribed by Title VII of the Civil Rights Act of 1964 and that the latter Act is the exclusive remedy for determining racial discrimination in employment practices. This contention pertains to a recently litigated issue in this Circuit: The interrelation of the remedies under two separate statutes, Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1866. Second, it is asserted that the only issue litigable in this lawsuit is the propriety of the testing procedures inasmuch as that was the only issue stated in the EEOC charge. Third, it is asserted that the scope of the class action maintainable by plaintiff must be limited to black employees hired in the labor department prior to 1957 who satisfied the educational requirements.

*A. Employment Discrimination: Title VII of the Civil Rights Act of 1964 vs. The Civil Rights Act of 1866*

Defendants contend that the remedy provided for in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, is the exclusive cause of action for racial discrimination in employment. The argument is thus made that, inasmuch as an indispensable party, Local 347, was not joined as a party within the statutory period prescribed by Title VII, this action is not maintainable. Such a theory of statutory construction based on the proposition that Title VII preempts previous remedies for discrimination in employment has recently been stripped of its viability in this Circuit. Indeed, it has been held that the Civil Rights Act of 1866, 42 U.S.C. § 1981, applies to racial discrimination in employment, and the remedies provided for in Title VII of the Civil Rights Act of 1964, in this regard, have been construed as a mere continuation of the remedies provided for in the earlier Act. Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971).

In *Sanders* the plaintiff, after exhausting the EEOC administrative procedures, but after the expiration of the thirty day jurisdictional period, filed a civil action pursuant to Title VII of the Civil Rights Act of 1964. After defendant sought to dismiss for lack of jurisdiction, plaintiff was able to state a cause of action by predicating jurisdiction upon the Civil Rights Act of 1866, 42 U.S.C. § 1981. In *Caldwell* the plaintiff chose not to pursue the EEOC administrative procedures, but instead filed a civil action pursuant to the Civil Rights Act of 1866. The Court after approving of the mutuality of the reme-

dies encompassed within the two Acts concluded that in this instance "due regard [must be given] to the conciliatory policy which is at the heart of Title VII while at the same time preserving the full remedy of § 1981." 443 F.2d at 1046. The Court referred to the power of the EEOC to assist in the conciliatory process pursuant to Title VII, as being applicable to an action under the Civil Rights Act of 1866. It was also suggested that Title VII conciliatory procedures should be resorted to as a matter of policy in actions brought pursuant to the Civil Rights Act of 1866, either with or without the trial court granting preliminary injunctive relief to maintain the status quo. The Court indicated that "[s]uch an approach melds the Title VII policy into the § 1981 remedy." 443 F.2d at 1046. *See* Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971); Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). In the instant case, it is this Court's conclusion that the policy condemning racial inequality in employment can be best promoted by providing a remedy pursuant to the Civil Rights Act of 1866. This approach is viewed as being entirely consistent with the policy of Title VII, inasmuch as the EEOC administrative procedures have been exhausted as to both defendants.

## B. *Scope of the Litigable Issues as Related to the EEOC Charge*

■■ Next, Goodyear contends that the only issue properly before the Court is the propriety of the testing procedure. It is urged that this is the only allegation presented in plaintiff's initial charge to the EEOC. In Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970), the permissible scope of a complaint pursuant to Title VII of the Civil Rights Act of 1964 was stated to be limited "to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination." 431 F.2d at 466. The scope of the EEOC charge is to be liberally construed. Danner v. Phillips Petroleum Co., 447 F.2d 159 (5th Cir. 1971). It is apparent that the above standard requires a reasonable relevancy between the EEOC charge in conjunction with the EEOC investigation and the scope of the civil action. Here, plaintiff's allegation of discrimination before the EEOC that "[t]he Goodyear Company has a practice of upgrading Negroes in one manner and the way they upgrade the white employees [is] different" and that Local 347 has failed to represent black employees fairly is reasonably relevant to defendants' allegedly discriminatory seniority system including the disputed educational and testing requirements.

## C. *Scope of the Class Action*

■ Defendants next contend that the scope of the class which plaintiff can properly represent pursuant to Rule 23(b)(2), Fed.R.Civ.P., must be limited to those black employees who meet the educational requirements and were hired in the labor department prior to 1957, except as to the matter of change in the seniority system which Goodyear contends should apply to a class composed of all blacks employed in the labor department prior to September 7, 1965. On the other hand, plaintiff contends that the class should be composed of all black employees in the labor department who have been discriminated against since July 2, 1965, because of the practices alleged in the complaint.

■ This Circuit has repeatedly emphasized that an employment discrimination action is by its very nature a class action for similarly situated fellow employees. Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968). Thus, a class action is permissible, even though only one of its members has presented a grievance to the EEOC. Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968). Measuring this suit against the legal standards contained

in these decisions, it appears to this Court that plaintiff has satisfied the requirements of Rule 23(a), Fed. R.Civ.P., for a class action. Further, since "the party opposing the class has acted or refused to act on grounds generally applicable to the class", the class action requirements of Rule 23(b)(2), Fed.R.Civ.P., are also satisfied. *See* Rowe v. General Motors Corp., 457 F.2d 348, 359–360 (5th Cir. 1972); Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969); Jenkins v. United Gas Corp., *supra*; Oatis v. Crown Zellerbach Corp., *supra*; Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Broussard v. Schlumberger Well Services, 315 F.Supp. 506 (S.D.Tex.1970); Hicks v. Crown Zellerbach Corp., 49 F.R.D. 184 (E.D. La.1968). *See also* Annot., 8 A.L.R.Fed. 461 (1971). The proper class for purposes of this lawsuit, as this Court views it after having examined and weighed the evidence forthcoming at the trial, is one composed of all black employees similarly situated to plaintiff who were hired in the labor department and who have been discriminated against as a result of defendants' employment practices alleged in the complaint.

### III.

*The Discriminatory Hiring Practices*

The purpose of Title VII of the Civil Rights Act of 1964 in outlawing discrimination in employment "was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." Griggs v. Duke Power Co., 401 U.S. 424, 429–430, 91 S. Ct. 849, 853, 28 L.Ed.2d 158 (1971). Accordingly, the Act prohibits all forms of racial discrimination, regardless of the degree or the employment situation involved. Local 189, United Papermakers and Paperworkers v. United States by Mitchell, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S. Ct. 926, 25 L.Ed.2d 100 (1970). The Fifth Circuit Court· of Appeals has taken a particularly strong stand in condemning this form of inequality among citizens:

> This Court has continuously given a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities. We have described this as "one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses."

Rowe v. General Motors Corp., 457 F.2d 348, 354 (5th Cir. 1972). The scope of the Civil Rights Act of 1866, 42 U.S.C. § 1981, in racial employment discrimination cases is similarly to be liberally construed. *See* Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S. Ct. 931, 30 L.Ed.2d 785 (1972); Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971). *See also* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). It is in this light that the evidence forthcoming at the trial of this lawsuit must be viewed.

Plaintiff presented undisputed evidence that black applicants for employment were hired solely for the unskilled labor department jobs until July 24, 1962. This constituted an obvious disparity in employment opportunities for black applicants. Plaintiff also presented evidence that from 1957 to the present time only five percent of the total applicants at the Goodyear plant have been initially employed into the labor department, whereas 48 percent of

all black applicants have been employed initially in the labor department.[1]

Goodyear, while admitting a history of past discrimination, asserts that it is not involved in any present discriminatory hiring practices and that it has not so engaged since early 1962. This defendant, accordingly, disputes the accuracy of the plaintiff's statistics. Goodyear's position is that plaintiff's statistics are of doubtful validity, since they fail to take into consideration the important fact that *all* new applicants employed at the Goodyear plant after April, 1971, are initially placed into the labor department as a matter of policy. Goodyear argues that these statistics are, therefore, misleading, inasmuch as a significant number of black employees were hired after April, 1971, who will accrue within a short time span sufficient seniority to transfer to non-labor department jobs. More importantly, Goodyear counters plaintiff's contentions through use of its own statistics to demonstrate that from January 1, 1962, to December 12, 1971, over 32 percent of all employees transferred or hired into non-labor department jobs have been black employees.[2] According to Goodyear, this employment picture in conjunction with the fact that the Houston area is composed of approximately 24 percent blacks, 8 percent Spanish-Americans and 68 percent whites refutes plaintiff's statistical evidence of discrimination.[3]

It is clear from the authorities that a substantial disparity in valid racial employment statistics serves to establish a prima facie case that race was a significant factor in an employer's hiring practices. Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972).

Once such disparity is persuasively demonstrated, the burden of proof is then placed upon the employer to come forward with acceptable reasons to refute the case of racial discrimination. In this regard, "mere conclusional statements that it had never discriminated against Negroes in [its] hiring" practices will clearly not suffice. Bing v. Roadway Express, Inc., 444 F.2d 687, 689 (5th Cir. 1971). However, in the application of this broad legal standard to the facts of this case including the relevant time period, the Court finds extreme difficulty in ascertaining from the record what plaintiff characterizes as proof of a prima facie case of hiring discrimination extending beyond July 2, 1965. In short, the statistical evidence presented and heavily relied upon by plaintiff for this time period is convincingly rebutted by the statistical evidence presented by Goodyear. Accordingly, the Court concludes that plaintiff has failed to make out a prima facie case, since for all practical purposes there is no significant or persuasive evidence that the discriminatory hiring practice extended beyond July 2, 1965. Of course, any evidence indicative of discrimination prior to July 2, 1965, is not relevant to plaintiff's present claim of hiring discrimination. This is so because, clearly, Title VII of the Civil Rights Act of 1964 does not provide a remedy for discriminatory hiring practices occurring prior to July 2, 1965, the date the Act became effective. Additionally, the applicable statute of limitations has expired as to any discriminatory hiring practice occurring prior to July 2, 1965, relevant to any cause of action plaintiff might have under the Civil Rights Act of 1866.[4]

1. Plaintiff's Exhibit No. 14.

2. Defendant Goodyear's Exhibit No. 14; see Defendant Goodyear's Exhibit No. 13. Compare Plaintiff's Exhibit Nos. 14, 15, 16, 17.

3. Defendant Goodyear's Exhibit Nos. 13, 14.

4. The Civil Rights Act of 1866, 42 U.S.C. § 1981, in conjunction with the applicable local statute of limitations, requires that the alleged discrimination occur within a four year period prior to the date the civil action is filed. Tex.Rev. Civ.Stat.Ann. art. 5529 (1958). See Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1971).

## IV.

### The Discriminatory Promotion And Transfer Practices

#### A. The Testing and Educational Requirements

 The absence of persuasive proof of overt racial discrimination in hiring after July 2, 1965, does not terminate the Court's scrutiny of Goodyear's employment practices. Congress has required "the removal of artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L. Ed.2d 158 (1971). The Court in the Griggs case indicated that "[u]nder the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 430, 91 S.Ct. at 853. Further, it was stated that:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance the practice is prohibited.

401 U.S. at 431, 91 S.Ct. at 853.

 Three factors should be considered in ascertaining if practices which are discriminatory in operation are rooted in overriding legitimate business necessity and therefore not violative of Title VII of the Civil Rights Act of 1964. First, the practice must be shown to be significantly related to successful job performance. Second, the practice must not operate to disqualify a substantially higher rate of minority group applicants than white applicants. Third, in making this determination it is significant if the employment positions un-

der scrutiny had formerly belonged to non-minority group employees in accordance with a long standing discriminatory practice. Rowe v. General Motors Corp., 457 F.2d 348, 354–355 (5th Cir. 1972).

#### 1. Black Employees Hired Prior to 1957

 Initially, it is obvious that the non-EEOC validated testing and educational requirements [5] could not validly be applied to black employees hired in the labor department prior to 1957, the year of the adoption of these employment and transfer criteria, when fellow white employees hired at the same time were not obligated to satisfy the requirement. This is clearly an instance of racial discrimination in operation. Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The effect of utilizing these requirements was to lock into the labor department those employees who were segregated initially into that department as a result of racially discriminatory hiring practices. United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); Broussard v. Schlumberger Well Services, 315 F.Supp. 506 (S.D.Tex. 1970). The total effect of these requirements was to preclude black employees from ever attaining the equivalent seniority status and commensurate employment advantages that white employees who were employed at the same time could attain. Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

#### 2. Black Employees Hired After 1957

 With reference to black employees who were hired in the labor department after 1957 and after the adoption of the non-EEOC validated employment and transfer criteria, there is a significant disparity in plaintiff's proof of the discriminatory effects of the educational and testing requirements. As

5. See 42 U.S.C. § 2000e–2(h) and 29 C.F.R. §§ 1607.3–1607.14.

to the educational requirement, plaintiff has established discrimination in operation, since this requirement disqualifies black applicants at a substantially higher rate than white applicants.[6] Goodyear has not seriously attempted to justify this practice by showing an overriding legitimate business necessity. However, with regard to the testing requirement and its application to these employees, the plaintiff has clearly failed to sustain his burden of proof. The evidence presented by plaintiff fails to indicate that the testing requirement disqualifies black applicants at a substantially higher rate than white applicants.[7] Accordingly, the Court finds for the defendants on the testing requirement.

### B. The Racially Neutral Seniority System

 Turning now to plaintiff's attack upon defendants' alleged racially neutral but prohibited seniority system, it was stated in Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 982–983 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), that "one of the most perplexing issues troubling the courts under Title VII [is] how to reconcile equal employment opportunity *today* with seniority expectations based on *yesterday's* built-in racial discrimination." It is the law that a racially neutral seniority system predicated upon past hiring racial discrimination is violative of Title VII. Accordingly, the Court in *Local 189* indicated that:

It is not decisive therefore that a seniority system may appear to be neutral on its face if the inevitable effect of tying the system to the *past* is to cut into the employees *present* right not to be discriminated against on the ground of race. The crux of the prob-

lem is how far the employer must go to undo the effects of past discrimination.

416 F.2d 988. In other words, if a neutral seniority system has the effect of perpetuating past hiring discrimination to a significant extent, then the employer is under an affirmative duty to implement corrective procedures to rectify this continuing wrong.

 The seniority transfer system employed by Goodyear, and acquiesced in by Local 347, had the effect of locking into the labor department the black employees who were initially segregated on a racially discriminatory basis. In order to transfer to a non-labor department job, a black employee had to forfeit his previously earned seniority rights in the labor department. As a result of this system, white applicants who entered a non-labor department position at the same time as black applicants were segregated into the labor department obtained and maintained a distinct advantage over fellow black employees, an advantage predicated solely on past racial discrimination. Goodyear offered essentially no proof which would extricate this system from condemnation because of a substantial business necessity. The fact that Goodyear shortly prior to trial offered to relax its seniority transfer requirement as to pre-September 7, 1965, labor department employees does not render moot this aspect of this lawsuit as to plaintiff or the class he represents. Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968). Accordingly, since Goodyear's seniority transfer system is predicated upon past racial discrimination in segregating black employees into the labor department, this system cannot withstand plaintiff's Title VII attack. Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971); Robinson v. Loril-

---

6. Plaintiff's Exhibit No. 8(a). *Compare* the statistics for the state of North Carolina as presented and relied upon in Griggs v. Duke Power Co., 401 U.S. 424, 430 n. 6, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

7. Plaintiff's Exhibit No. 18 reflects that between March 31, 1969, and September 30, 1971, 132 black applicants failed the test as compared to 126 white applicants. This is a difference of less than six percent.

lard Corp., 444 F.2d 791 (4th Cir. 1971); Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); Local 189, United Papermakers and Paperworkers v. United States by Mitchell, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); Quarles v. Philip Morris, Inc., 279 F. Supp. 505 (E.D.Va.1968). Additionally, since this discriminatory practice affects the right of plaintiff and the class he represents to contract for employment and is embodied within the collective bargaining argeement, for which Goodyear and Local 347 are mutually responsible, this practice is violative of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The latter section prohibits private racial discrimination in employment by either an employer or labor union. *See* Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L. Ed.2d 785 (1972); Young v. International Telphone & Telegraph Co., 438 F. 2d 757 (3d Cir. 1971); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970).

This Court requested that the parties submit a remedial seniority transfer proposal encompassing the appropriate and necessary changes in the presently employed seniority system, as stated in the collective bargaining agreement between Goodyear and Local 347, which would be adequate to effectuate the policies of the Acts if the Court decided the present system was discriminatory as to plaintiff or the class he represents. The parties are in basic agreement as to the mechanics of such a proposal. However, as to the employees entitled to the benefits of such remedial seniority rights there is irreconcilable disagreement.

Plaintiff would apply the proposal to all black employees hired in the labor department prior to the Court's injunctive order of November 19, 1971. Goodyear, on the other hand and at the request of the Office of Federal Contract Compliance, would apply the proposal to all labor department employees hired prior to September 7, 1965, the date on which the first white applicant was employed into the labor department. Local 347 in concurring with Goodyear would apply the proposal to all employees hired in any seniority group at the plant. It is the conclusion of the Court that the policies of both Acts can best be served in view of the Court's previous factual determination without unnecessary discrimination against other employees, white or black, by the adoption of the proposal submitted by Goodyear. The mechanics of the stipulated remedial seniority transfer proposal are detailed as follows:

1. Such employees presently in divisional seniority groups other than the Labor Department, or such employees hereafter transferred from the Labor Department to entry level jobs in other seniority groups, shall be vested with remedial group seniority equivalent to their plant seniority.

2. Such employees shall be entitled to use such remedial group seniority for all purposes presently determined by group seniority under the provisions of the collective bargaining agreement between the Company and Union dated July 30, 1970.

3. Such remedial group seniority shall cease upon occurrence of either of the following:

(a) In the case of an employee who transfers from the Labor Department to the Production Group, such remedial seniority shall cease if the employee advances beyond the entry level of such Group and subsequently transfers to another seniority group.

(b) In the case of an employee who transfers from the Labor De-

partment to any seniority group other than the Production Group, such remedial seniority shall cease if the employee subsequently transfers to another seniority group.

4. Such remedial seniority rights shall apply to an employee's first transfer out of the Labor Department.

The remedial seniority transfer rights, as set forth above, shall be subject to reasonable rules and regulations as established by Goodyear and Local 347 to insure the safe and efficient operation of the plant as well as to insure that any employee seeking to exercise these transfer rights is reasonably qualified for the job sought. However, no member of the class involved herein to which the remedy applies shall be subjected to any unduly burdensome residency requirement in a new department prior to moving up through the various lines of job progression which was not previously required of similarly situated employees, white or black, as a condition to the exercise of this remedial seniority in any new department.

## V.

### *The Significance Of Defendant Goodyear's Good Faith Effort To Eliminate Discrimination*

The Court feels that in fairness to defendant Goodyear it is necessary to make an additional observation with reference to the proof forthcoming at the trial of this cause. This lawsuit does not pose a blatant instance in which an employer, or a labor union, has deliberately or consciously employed continuous racially discriminatory practices. To the contrary, the record reflects that Goodyear has willingly and apparently in good faith attempted to eliminate past discrimination. However, notwithstanding the propriety of Goodyear's affirmative action program, "the question is whether on this record—and despite the efforts toward conscientious fulfill-ment—the employer still has practices which violate the Act." Rowe v. General Motors Corp., 457 F.2d 348, 355 (5th Cir. 1972). Neither Goodyear's voluntary changes in the seniority provision, nor its abandonment of the testing and educational requirements prior to trial alleviates the need for declaratory and injunctive relief in order to effectuate the changes in these employment practices and to insure that they are not reinstituted. Rowe v. General Motors Corp., *supra*, at 359.

## VI.

### *Injunctive Relief*

For the reasons stated in Part IV(A)(1) of this opinion, plaintiff and the class he represents shall be granted permanent injunctive relief to the extent that Goodyear is prohibited from reinstituting the testing and educational requirements with respect to labor department employees hired prior to 1957, the year these requirements were instituted. In accord with Part IV(A)(2) of this opinion, permanent injunctive relief is also granted to plaintiff and the class he represents in order to preclude reinstitution of the educational requirement by Goodyear as a condition for transfer to positions where black employees were previously discriminated against as a result of being segregated into the labor department. Further in accord with Part IV(B) of this opinion, permanent injunctive relief is granted to the extent that the previously employed seniority system as embodied in the collective bargaining agreement between Goodyear and Local 347 is hereby modified so that the heretofore described remedial seniority transfer system can be instituted.

## VII.

### *Damages—Backpay and Attorney's Fees*

The Court, after having considered the applicable law and all of the ev-

18

idence forthcoming at the trial of this suit, finds that in order to effectuate the policies of both Acts the named plaintiff shall be entitled to the recovery of back pay from Goodyear as compensation for tangible economic loss resulting from these past racially discriminatory practices. The obligation to provide back pay stems from the same source as the obligation to remedy the discriminatory employment and transfer criteria as applied to this black employee who was hired into the labor department prior to 1957, the year of adoption of these employment requirements. The measure of damages is the difference between plaintiff's actual earnings during the relevant period [8] and those which in all probability he would have earned had he not been locked in the less desirable employment positions found in the previously segregated labor department. Further, plaintiff is entitled to reasonable attorney's fees. Counsel shall be given thirty (30) days to agree to an appropriate amount of back pay and reasonable attorney's fees to be awarded to plaintiff. If counsel are unable to agree on a fair dollar amount after engaging in bona fide discussions to achieve such an end, then the Court will promptly schedule a hearing to ascertain and assess such a monetary award.

The foregoing constitute the Court's Findings of Fact and Conclusions of Law. Subject to the above directive concerning the ascertainment of damages, counsel will prepare and submit an appropriate judgment within thirty (30) days incorporating these Findings of Fact and Conclusions of Law and reciting, if agreed upon, the stipulated back pay and attorney's fees due plaintiff as well as the proper assessment of interest and costs. The clerk will notify counsel.

8. In order to effectuate the policies of the Acts in conjunction with 42 U.S.C. § 2000e–5(d) and Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972), the

Court, pursuant to its discretion, concludes that plaintiff's backpay remedy should extend from February 4, 1967, which is ninety days prior to the date the EEOC charge was filed.